UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DEBORAH CLARK,

Plaintiff,

v.

PATRICK R. DONAHOE,

Defendant.

Case No. 2:11-CV-00597
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Norah McCann King

## OPINION AND ORDER

Plaintiff Deborah M. Clark ("Clark") brings this action against Defendant, Patrick R. Donahoe, Postmaster General, the United States Postal Service ("USPS"), alleging sex discrimination based on a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Clark seeks compensatory and punitive damages, attorneys fees and costs, and an equitable cease and desist order. This matter is currently before the Court for consideration of Defendant's Motion for Summary Judgment. (ECF No. 24.) For the reasons that follow, Defendant's Motion is **GRANTED** in part and **DENIED** in part.

## I. BACKGROUND

Clark is an employee for the USPS in Cadiz, Ohio. She began working at the Cadiz office in October 2002. (Pl. Dep. 20, ECF No. 23-1.) While working at the Cadiz office, Clark has worked under the supervision of two Postmasters. Carl Coffland ("Coffland") served as Postmaster from 2002 to 2004. (*See id.* at 26, 28.) Robert Cline ("Cline") became Postmaster in June of 2004 and is the current Cadiz Postmaster. (*See id.* at 28.) Clark's current position is Sales and Service Associate. (Cline Dep. 26, ECF No. 23-2.) In Cline's absence, Clark serves as

the temporary Postmaster at a heightened pay grade. (*Id.* at 26–27.)

This action centers around Clark's contention that her co-workers, including Cline, created a hostile work environment based on sex. In addition to Cline, Clark averred that co-workers George Hale ("Hale"), John Carrel ("Carrel"),[1] Alva Gailbreath ("Gailbreath"), Mike Chelsea ("Chelsea"), Jon Frazier ("Frazier"), and Calvin Mickey ("Mickey") all contributed to this environment. (Pl. Dep. 29; Pl. EEO Aff. 2–3, ECF No. 24-8.[2])

## A.      Alleged Conduct from 2002 to 2004

Clark testified that upon transferring to Cadiz in 2002 she found that "[w]omen were treated differently from day one" and were specifically treated as "second class people." (Pl. Dep. 28.) According to Clark, from 2002 until Cline arrived in 2004, male co-workers made sexual comments about women's body parts on a daily basis. (Pl. Dep. 33.) Clark stated that such comments were not made towards her, but were about women in general. (*Id.*)

Clark also testified that co-workers Hale and Carrel harassed her directly during this period. Specifically, Clark asserted that Hale purposely rubbed his body against her when retrieving mail. (*Id.* at 31.) Clark further stated that when she asked Hale to stop, he was not responsive. (*Id.* at 32.) She estimated that this pattern of contact occurred four or five times. (*Id.*) Clark stated that she ultimately discussed Hale's conduct with then-postmaster Coffland. (*Id.*) Coffland decided that Hale would no longer retrieve his mail from Clark. (Pl. Dep. 32.)

---

[1]  At some points in the record, Carrel is also referred to as "Rick Carrel." (*See, e.g.*, Pl. Dep. 79.)

[2]  Defendant attaches, as Exhibit H to the Motion for Summary Judgment, an affidavit that Clark submitted—and signed under penalty of perjury—during an Equal Employment Opportunity ("EEO") investigation in May 2009. The Court will cite to this document as "Pl. EEO Aff."

Clark reported that, during this same time frame, Carrel would also brush against her breasts and butt, and press his body into her. (*Id.* at 69–70.) Additionally, Clark stated that Carrel would attempt to "flirt" with her by making suggestive comments. (*See id.* at 95–97.) For example, Clark stated that Carrel made a comment about her breasts and talked about "how he's had sex with most of the women in town." (*Id.* at 95–96.) According to Clark, Carrel made such comments randomly over the course of her first couple of years at Cadiz. (*Id.* at 96.) Clark testified that she eventually told Carrel not to speak to her unless he could do so in a professional manner. (*Id.*) Clark's deposition testimony reflects that she also threatened to file a sexual harassment suit against Carrel. (Pl. Dep. 97.) She asserted that after she made these statements, Carrel stopped speaking to her altogether, and referred to her using terms such as "lazy bitch" and "asshole." (*Id.* at 98–99.) Clark found this conduct threatening and states that she "was always scared to be alone with [Carrol]." (*Id.* at 98.)

**B.     Alleged Conduct from 2004 to 2009**

According to Clark, when Cline became postmaster in 2004, the environment at the Cadiz office significantly deteriorated because Cline joined in with male co-workers, making disrespectful remarks and jokes about women. (*Id.* at 35.) Clark averred that her co-workers would always make sexual comments about female customers who came into the post office. (Pl. EEO Aff. 3.) More specifically, Clark provided that male co-workers commented on female customers' "breasts, behinds, and [] weight . . . ." (*Id.*) Clark also testified that she heard male employees ask a female co-worker, Wanda Ledger, whether she "cleaned her house in the nude

3

or mow[ed] her lawn in the nude."[3]  (Pl. Dep. 77.)  Clark reported that this type of behavior

continued into 2009.  (Pl. EEO Aff. 3, 9.)

Within a 2009 affidavit, Michelle Maley ("Maley")—a part-time employee who worked

one day a week at the Cadiz office—confirmed that since 2005 male employees had made

sexually oriented remarks about females.  (Maley EEO Aff. 2, ECF No. 24-5; Maley Dep. 10,

ECF no. 23-5.)  Maley also averred, however, that female co-workers made sexually oriented

remarks.  (Maley EEO Aff. 2.)  Maley further stated that Carrel's behavior around her had

"always been good."  (Id. at 4.)  At a July 2012 deposition, Maley was unable to recall in any

detail what comments her co-workers made.  (See Maley Dep. 13–17.)

In addition to general comments, Clark stated that her male co-workers kept binoculars in

the Cadiz office, which they used to look at women coming and going from the post office and a

nearby grocery store.  (Pl. EEO Aff. 3.)  Cline testified that, as far as he witnessed, employees

used the binoculars to look at the temperature reading on a bank down the street from the post

office.  (Cline Dep. 23, ECF No. 23-2.)  Gailbreath stated that he did not know who owned the

binoculars or their purpose, and that he was not aware that they were used to look at women.[4]

(Gailbreath Dep. 13–14, ECF No. 23-3.)

As detailed above, Clark testified that Cline took part in the conduct at issue.  (Pl. Dep.

37.)  According to Clark, on one occasion Cline left an offensive email lying on his desk,

---

[3] The exact time such comments were made is not clear from the record.  (See Pl. Dep.
76–78.)  Ms. Ledger worked at the Cadiz office during the entire time period relevant to this
lawsuit.  (Id. at 76.)

[4] Gailbreath also testified that he could not recall any co-workers making sexual
comments about women.  (Gailbreath Dep. 14.)

4

knowing she would fill in as postmaster on that day, and, as a result, would see the email. (*Id.* at 88–89.) Clark also asserted that on another occasion, Cline ignored her request for training until she filed a union grievance. (*Id.* at 126–27.)

Clark stated that, at some point when Cline was out of the office, she had an altercation with Hale. (*Id.* at 61.) According to Clark, Hale screamed and threatened her, while pushing his body into her. (*Id.* at 61–62.) She stated that Debby Velez, a temporary Postmaster who was filling in for Cline, had to stop the altercation. (*Id.* at 62.) Clark further testified that, following the altercation, she received a message from Cline—through Ms. Velez—stating that if she "filed a complaint that [she would] be in more trouble than [Hale]." (Pl. Dep. 64.) Clark ultimately filed a police report in light of the incident. (*Id.* at 63.)

Clark also testified regarding Carrel's conduct while Cline was Postmaster. (*See* Pl. EEO Aff. 3.) She asserted that, from December 2007 to July 2008, Carrel repeatedly scratched the sides of her car with a key and hit her car with the door of his own vehicle. (*Id.*) Clark averred that Carrel called her an "asshole" in February 2008 in front of customers. (*Id.* at 2.) She further reported that, in June 2008, Carrel removed $100.00 from Clark's register drawer without her knowing, causing her to be unable to close out her drawer. (*Id.* at 3.) Clark stated that—once again in June 2008—Carrel failed to turn in a form Clark prepared requesting a flag from the United States Department of Veterans Affairs. (*Id.*) According to Clark, Carrel turned in such requests from her male co-workers. (*Id.*) Finally, Clark averred that in April 2009 Carrel slammed a drawer into her leg. ( Pl. EEO Aff. 3.)

With regard to co-worker Gailbreath, Clark stated that he is hostile to all Cadiz employees. (Pl. Dep. 111–12.) Clark testified that, in November 2009, she and Gailbreath had a

verbal altercation that resulted in Clark calling the police. (*Id.* at 103–04.)  As a result of this incident, a USPS labor relations representative came to the office and spoke with her, Gailbreath, and Cline about the dispute. (*Id.* at 118, 120–21.)  Additionally, Clark reported that Gailbreath often made comments about her weight. (*Id.* at 72–73.)  For example, Clark stated that Gailbreath "mooed" at her and commented about making areas wider so that Clark could pass through. (*Id.* at 73.)

C.      **Complaints and Counseling**

According to Clark, she made complaints to Cline regarding what was happening in the office. (*Id.* at 37; Pl. EEO Aff. 5, 7.)  She asserted that Cline would ignore the complaints and nothing would be resolved. (*Id.*)  Clark specifically reported telling "Cline about the harassment on several occasions" including an incident in which Carrel failed to submit her flag request and when he hit her with a drawer. (Pl. EEO Aff. 7.)  Clark stated that Cline would make jokes about the complaints to others in the office. (Pl. Dep. 38.)  Clark testified that at one point she complained about the way her male co-workers were treating her and in particular Carrel's name calling. (*Id.* at 38, 99.)  She asserted that Cline's response was to tell all of the employees "to quit having pissing matches." (*Id.* at 38.)  Clark stated that, despite Cline's instruction, she continued to receive demeaning comments. (*Id.*)  She also averred that, on February 2, 2009, Cline made an office announcement instructing employees to stop making sexual and inappropriate remarks about women. (Pl. EEO Aff. 6.)  Based on Clark's account, during the announcement Cline explained that a new female employee would be starting in the office and that the employee had filed a complaint in the past and might do so again. (*Id.*)

Within an EEO affidavit, Cline averred that Clark had never complained to him about a

6

hostile work environment.[5]  (Cline EEO Aff. 2.)  Relatedly, Cline testified that he could not

recall ever receiving a written complaint regarding his job performance.  (Cline Dep. 28.)  Cline

stated that Clark did complain regarding Carrel's refusal to speak to her, which she labeled as

sexual harassment.  (Cline EEO Aff. 2; *see also* Cline Dep. 38.)  Cline also confirmed that Clark

made other complaints to him regarding Carrel's behavior, such as the purported name calling

and damage to Clark's car.  (Cline EEO Aff. 2–3.)  Cline averred that Clark never complained to

him regarding inappropriate remarks about females or any activity concerning binoculars.  (*Id.* at

3.)

       Cline indicated that his general approach to Clark's complaints was to speak with the

individuals involved.  (Cline Dep. 15, 32.)  Cline testified that he was unable to discipline

anyone, however, without corroborating evidence of Clark's complaints.  (*Id.* at 32.)  Cline also

stated that there were some occasions when he would take witness statements from employees.

(*Id.* at 46.)  Cline admitted that there was an occasion when he told Carrel and Clark "to quit

having pissing matches."  (*Id.* at 18.)  According to Cline, this instruction referred to Carrel and

Clark's "inability to get along."  (*Id.*)

       In addition to making complaints regarding the purported conduct, Clark testified that she

began counseling in late 2007 due to her work environment.  (*See* Pl. Dep. 40–43.)  Clark

specifically saw a licensed professional clinical counselor through the USPS's Employee

Assistance Program.  (Mikita Dep. 13, ECF No. 23-4; Pl. Dep. 39.)  The record reflects that

---

[5] Within a seperate EEO affidavit, co-worker Frazier averred that Clark did discuss
matters of "harassment/hostile work environment" with him.  (Frazier EEO Aff. 4, ECF No. 31-
2.)  According to Frazier, Clark "complained at least weekly about someone or something in the
Cadiz Officer."  (*Id.*)

during the course of her counseling, Clark shared a number of her workplace experiences with her counselor. (*See, e.g.*, Pl. Dep. 39, 67.) In 2009, the counselor diagnosed her with "major depression, anxiety, and symptoms of post-traumatic stress disorder" attributed to Clark's work environment. (Mikita Dep. 50, 53–54.) Clark's counselor testified that these diagnoses were based on the information Clark provided as well as personal observation of Clark at counseling sessions. (*Id.* at 55–57.)

### D.    Delayed Call-Back

In August 2008, Cline took leave from work to undergo knee surgery. (Pl. EEO Aff. 10.) Cline averred that he received a note from Clark's physician stating that she could return to work on October 4, 2008, with restrictions—lasting until December 2008—including that she could not lift more than twenty pounds. (Cline EEO Aff. 4.) Cline stated that Clark could not return to work with such restrictions because Clark's position required constant lifting of up to seventy pounds. (*Id.*; Cline Dep. 41.)

According to Cline, shortly after he told Clark she could not return to work with her restrictions, he received a fax from the same physician stating that Clark could return to work with no restrictions on October 20, 2008. (Cline EEO Aff. 4.) Cline averred that, given the inconsistency of the physician's reports, he involved labor relations and the USPS's health unit. (*Id.*) Clark testified that after a health unit examination, the only restriction she received was with regard to kneeling on her left knee. (Pl. EEO Aff. 10.) On October 24, 2008, Clark applied to return to work in a light duty capacity. (*Id.*) Cline stated that he denied this request due to the health unit's assessment as well as the inconsistency of prior reports. (Cline EEO Aff. 4.) Within her EEO affidavit, Clark reported that on November 3, 2008 she received clearance from

8

her family doctor to return to work without restrictions. (Clark EEO Aff. 16.)  The USPS health

unit released Clark to return to work without restrictions on December 8, 2008 and she ultimately

returned to work on December 9, 2008.  (*Id.*)  According to Clark, Cline allowed other male

employees to return to work, or have physical accommodations, without going through a similar

process.  (*Id.* at 12.)

      In addition to a delay in her return to work, Clark also testified that her work hours were

reduced after she filed an EEO complaint.  (Clark Dep. 25.)  Clark stated, however, that she did

not think she was the only employee to have her hours reduced.  (*Id.* at 26.)  Additionally, Clark

could not provide any reason to believe that her hour reduction was related to the complaint.  (*Id.*

at 26.)  At her deposition, Clark indicated that her hours had expanded over the last year and a

half.  (*Id.* at 80.)

**E.**     **Procedural History**

      Clark initially contacted the EEO office on December 10, 2008, following her return to

work.  (Def.'s Mot. Summ. J. Ex. I at 1, ECF No. 24-9.)  In March 2009, Clark filed a formal

EEO complaint.  (Def.'s Mot. Summ. J. Ex. K, ECF No. 24-11.)  Clark filed this action in July

2011, bringing two claims for Title VII violations.  Specifically, Clark maintains that Cline and

her other co-workers (1) created a hostile work environment and (2) engaged in retaliatory

action.[6]

      Defendant moves for summary judgment as to both of Clark's claims.  Defendant

maintains, in part, that the conduct in question is not sufficiently severe or pervasive to constitute

---

     [6] Although the Complaint labels Clark's hostile work environment claim simply as
discrimination based upon sex (Compl. ¶ 12, ECF No. 1), her pleadings and briefing make clear
that she is proceeding pursuant to a hostile work environment theory.

a hostile work environment based on gender discrimination. Additionally, Defendant contends that Clark fails to present sufficient evidence to establish retaliation.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is

10

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

### III. ANALYSIS

#### A.    Hostile Work Environment

##### 1.    Applicable Law

The Court will first address Clark's hostile work environment claim.  It is well established that "Title VII offers employees protection from a 'workplace [ ] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . .'" *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 514 (6th Cir. 2009) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To establish a *prima facie* case for a hostile-work-environment claim based on sexual discrimination under Title VII, a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. *Ladd v. Grand Trunk Western R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009).

"To establish that the harm was 'based on her sex,' [a plaintiff] 'must show that but for the fact of her sex, she would not have been the object of harassment.'" *Farra v. Gen. Motors Corp.*, 163 F. Supp.2d 894, 906 (S.D. Ohio 2001) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999)).  Notably, the United States Court of Appeals for the Sixth Circuit recognizes that "harassing behavior that is not sexually explicit but is directed at women and

11

motivated by discriminatory animus against women satisfies the 'based on sex' requirement."
*Williams*, 187 F.3d at 565; *see also Ladd*, 552 F.3d at 500 ("[S]exual animus can be inferred
from conduct not overtly sexual in nature when the context suggests it.").

    To be actionable, a plaintiff must establish that the harassment in question "had the effect
of unreasonably interfering with her work performance and created an objectively intimidating,
hostile, or offensive work environment." *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874,
878 (6th Cir. 2013). In other terms, the conduct in question "must be severe or pervasive enough
to create an environment that a reasonable person would find hostile or abusive and the victim
must subjectively regard that environment as abusive." *Id.*; *see also Barrett v. Whirlpool Corp.*,
556 F.3d 502, 514 (6th Cir. 2009) (explaining that "'severe or pervasive' is properly considered
in the disjunctive"). When determining whether the alleged harassment is sufficiently severe or
pervasive to constitute a hostile work environment, the Court must look to the "totality of the
circumstances" relating to the workplace environment. *Williams*, 187 F.3d at 562; *cf. also
Austion v. City of Clarksville*, 244 F. App'x 639, 649 (6th Cir. 2007) (holding that, within the
hostile work environment context, the Court may look to "a series of separate acts that
collectively constitute" discrimination, even if "some of the component acts of the hostile work
environment fall outside the statutory time period"). Courts may consider a number of factors,
including "the frequency of the discriminatory conduct; its severity; whether it is physically
threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes
with an employee's performance." *Harris*, 510 U.S. at 23.

    The inquiry relating to the seriousness of the harrassment "is not subject to any precise
mathematical test." *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 324 (6th Cir. 2010). On

the one hand, Title VII is not a "code of workplace civility" and "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to a hostile work environment." *Rayford v. Illinois Cent. R.R.*, 489 F. App'x 1, 5 (6th Cir. 2012) (internal quotations omitted). At the same time, gender based comments and remarks will weigh in favor of a pervasiveness finding when they are " commonplace, ongoing, and continual" in nature. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998); *see also Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 337 (6th Cir. 2008) ("[A] serial harrasser left free to harass again leaves the impression that acts of harassment are tolerated at the workplace . . . ."). Importantly, sex-based conduct and comments "need not be directed at a plaintiff in order to constitute conduct violating Title VII," although courts generally consider actions specifically directed at a plaintiff to be more severe. *Abeita,* 159 F.3d at 251 (internal quotations omitted); *cf. also Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 273 (6th Cir. 2009) (stressing that although conduct was not directed at the plaintiff, due to the work setting, it was impossible for the plaintiff to avoid the offensive conduct).

A hostile work environment claim also requires that the harassment in question "interfer[e] with [the plaintiff's] work performance . . . ." *Warf*, 713 F.3d at 878. Nevertheless, "a plaintiff need not prove a tangible decline in her work productivity; only that the harassment made it more difficult to do the job." *Gallagher.*, 567 F.3d at 274.

Finally, " employers are not automatically liable for sexual harassment perpetrated by their employees." *Rayford*, 489 F. App'x at 5 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)). The Sixth Circuit has specifically provided:

Where an employee is the victim of sexual harassment in the form of a hostile work

13

environment by a co-worker, an employer's liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. *See Faragher*, 524 U.S. at 789. Where the harassment is attributed to a supervisor, a court looks first to whether the supervisor's behavior "culminate[d] in a tangible employment action" against the employee. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. If so, the employer will be liable. *See Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009). If there has been no tangible action, an employer will be liable for a hostile work environment created by a supervisors unless it establishes as an affirmative defense that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (b) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *accord Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

*Id.* at 5–6.

### 2. Discussion

In this case, Clark provides sufficient evidence to survive summary judgment on her hostile work environment claim.[7] First, based on the current record, a reasonable jury could conclude that Clark was subject to harassment based on sex. Specifically, crediting Clark's testimony, she experienced conduct of a sexual and/or gender-based nature. Upon initially transferring to the Cadiz office, Clark testified that she was immediately faced with inappropriate touching—and suggestive comments—from Hale and Carrel. Although Clark's complaints and

_____

[7] To the extent Defendant challenges the nature of Clark's evidence, such contentions are unpersuasive. Here, Clark relies primarily on her own deposition testimony and an affidavit she submitted during EEO proceedings. Of course, a plaintiff facing summary judgment cannot rest on mere allegations. Nevertheless, "a plaintiff's deposition testimony submitted in response to a summary judgment motion may be sufficient to create a genuine issue of material fact." *Cranpark, Inc. v. Rogers Grp., Inc.*, 498 F. App'x 563, 571 (6th Cir. 2012). Moreover, as a general rule, "[c]ourts may not resolve credibility disputes on summary judgment." *Dawson v. Dorman*, No. 12–6163, 2013 WL 2397410, at *2 (6th Cir. June 3, 2013). Under the circumstances of this case, it is not surprising that Clark's testimony paints a different picture of the work atmosphere than that of her supervisor and some of her co-workers. After all, Clark claims she was the victim of an unlawful work environment that her supervisor and co-workers created.

14

responses to such conduct ended the physical contact, Carrel stopped speaking with her and began referring to her using derogatory names including "lazy bitch." *See Williams*, 187 F.3d at 565–66 (holding that gender specific epithets such as "slut" and "f—ing women" were indicative of gender bias). Moreover, Clark testified that from 2002 until 2009 her co-workers—including Cline—routinely made sexually charged commentary about female customers and co-workers. Under such circumstances, there is sufficient evidence that Clark encountered gender-based harassment in the workplace.[8]

Second, construing the evidence in Clark's favor, there is a genuine issue of fact as to whether the conduct in question was sufficiently pervasive to meet objective requirements. Once again, Clark stated that, on a daily basis over a seven-year period, her co-workers made remarks objectifying women, including commentary on female customers' "breasts, behinds, and []weight . . . ." (Pl. EEO Aff. 3.) Clark also testified to specific inappropriate remarks her male co-workers directed at a female co-worker, Wanda Ledger. Along with verbal harassment, Clark stated that male employees used binoculars to examine women's bodies. According to Clark, the atmosphere of the office only became worse when Cline took over as postmaster in 2004, as he participated in much of the activity. Such evidence—if credited—reflects that the behavior at issue was both commonplace and ongoing in nature. *See Abeita*, 159 F.3d at 248, 252 (reversing

---

[8] In addition to overtly sexual and/or gender based conduct, Clark also testified to experiencing ongoing harassment of a more general nature. For example, Clark stated that Carrel vandalized her vehicle. The parties dispute whether the record allows for an inference that gender animus motivated such conduct. Because this case also involves substantial conduct, according to the sworn statement of Clark, that is sex and/or gender based in nature, it is unnecessary for the Court to resolve this issue at the present time. *Cf. Gallagher*, 567 F.3d at 271 (holding that additional showing of motivation was not necessary when conduct was "explicitly sexual and patently degrading of women").

15

grant of summary judgment when a plaintiff presented evidence that her supervisor made sexual and gender-based comments on a continual basis).

Moreover, although much of the conduct in question was general in nature, Clark's testimony further reflects that her co-workers directed some action specifically at Clark. As detailed above, during her early period at Cadiz, Clark asserted that Hale and Carrel engaged in conduct—including inappropriate physical contact—that they specifically directed at her. After Clark rejected Carrol's advances, Clark testified that he resorted to giving her the silent treatment and calling her vulgar names. Clark further stated that Cline left an offensive email on his desk, knowing that Clark—as temporary Postmaster—would find it. Clark also testified that another co-worker, Gailbreath, "mooed" at her and made comments regarding her weight. (Pl. Dep. 73.) According to Clark, Carrel refused to process her flag request, but completed requests for the male co-workers. Ultimately, considering the totality of the circumstances, and drawing inferences in Clark's favor, a reasonable jury could find that the work place environment was sufficiently hostile to constitute a Title VII violation.

Third, the trier of fact could also conclude that the conduct in question interfered with Clark's job performance. Again, Clark need not prove that her work performance tangibly declined, only that the harassment made her job more difficult to perform. Here, while Clark continued to fulfill her job responsibilities and served as a fill-in Postmaster, much of the evidence reflects that Clark subjectively found the work environment abusive. Clark testified that she took the daily remarks concerning women personally, dreaded coming to work, and felt uncomfortable around some of her co-workers. It is clear from the record that Clark sought counseling, and she attributed this decision to her work environment. As detailed above, Clark's

16

counselor diagnosed her with "major depression, anxiety, and symptoms of post-traumatic stress disorder" which the counselor attributed to Clark's work environment.[9]  (Mikita Dep. 50, 53–54.) Under these circumstances, there is a genuine dispute of fact surrounding whether the conduct in question made it more difficult for Clark to perform her work.

Finally, there is sufficient evidence to allow a reasonable jury to find employer liability. This case presents issues of both notice to, and conduct of, a supervisor.  According to Clark, she complained to Cline on multiple occasions regarding the conduct of her male co-workers. Although there is some question as to the specificity of Clark's complaints, even Cline's testimony reflects that Clark complained to him about conduct she believed to be sexual harassment.  (*See* Cline EEO Aff. 2.)  Drawing reasonable inferences in Clark's favor—and also noting Clark's testimony regarding Cline's own behavior—a jury could find that Cline was on sufficient notice of the conduct in question.  Additionally, Clark stated that, despite her complaints, Cline failed to take any significant corrective action, at one point telling employees "to quit having pissing matches."[10]  (Pl. Dep. 38.)  Clark further testified that Cline personally engaged in much of the activity at issue.  Given Cline's role as Clark's supervisor, a dispute of

---

[9] The parties dispute the extent to which the testimony of Clark's counselor is admissible.  The Court finds it unnecessary to resolve such evidentiary issues at this time.  Under the circumstances of this case, even omitting evidence from Clark's counselor, Clark's own testimony regarding the impact of her working environment—and her own testimony regarding counseling—establishes issues of fact as to the effect the work environment had on Clark.

[10] As detailed above, Clark did testify that in 2009, Cline warned employees about sexual harassment because a new female employee—who had made complaints in the past—was beginning in the Cadiz office.  (*See* Pl. EEO Aff. 6.)

17

fact remains concerning whether Clark may hold Defendant liable as her employer.[11]

## B.    Retaliation

In addition to her hostile work environment claim, Clark maintains that Defendant retaliated against her in violation of Title VII based on her complaints about discrimination and EEO activity.  Plaintiff primarily focuses her retaliation claim on her delayed return to work in 2008.  Defendant maintains that Plaintiff fails to establish a *prima facie* case of retaliation. Additionally, Defendant contends that Plaintiff's delayed return to work was a product of her medical restrictions and the inconsistent reports she provided.

To establish a *prima facie* case of Title VII retaliation, a plaintiff must show that:

(1) [she] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  Within the retaliation context, an adverse employment action is one that might dissuade a reasonable employee "from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  An employer will be liable for retaliatory actions of a co-worker when a supervisor knew of the retaliatory behavior and "condoned, tolerated, or encouraged the acts of

---

[11]   Defendant briefly maintains that employer liability is improper because Cline took appropriate corrective action.  For example, Defendant emphasizes that Cline brought in labor relation representatives to speak with Gailbreath and Clark following their 2009 altercation. Defendant's assertion, however, relies heavily on Cline's account of events and largely ignores Clark's testimony regarding Cline's own personal gender-based conduct.  In light of Clark's testimony that Cline failed to respond to at least some of her complaints, as well as her testimony concerning Cline's participation in creating the work environment, there is a factual dispute as to whether Cline took appropriate corrective action.

retaliation, or [] responded to the plaintiff's complaints so inadequately that the response

manifests indifference or unreasonableness under the circumstances." *Hawkins*, 517 F.3d at 347.

To demonstrate a causal connection, "the plaintiff must produce sufficient evidence from

which one could draw an inference" that the adverse action would not have occurred "had the

plaintiff not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co.*, 348 F.3d

537, 543 (6th Cir. 2003). The Sixth Circuit has acknowledged that "[w]here an adverse

employment action occurs very close in time after an employer learns of a protected activity,

such temporal proximity between the events is significant enough to constitute evidence of a

causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v.

Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Nevertheless, "where some time

elapses between when the employer learns of a protected activity and the subsequent adverse

employment action, the employee must couple temporal proximity with other evidence of

retaliatory conduct to establish causality." *Id.*

Once a plaintiff establishes a prima facie case, the employer must offer a legitimate,

nondiscriminatory reason for the adverse action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530

(6th Cir. 2012). If the employer meets this requirement, the plaintiff must then show that the

proffered reason is actually a pretext for unlawful retaliation. *Id.* "[A] plaintiff can show pretext

in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered

reasons did not actually motivate the employer's action, or (3) that they were insufficient to

motivate the employer's action." *Id.* (internal quotations omitted). "[A]t bottom the question is

always whether the employer made up its stated reason to conceal intentional [retaliation]." *Id.*

(internal quotations omitted).

19

Here, even assuming Clark satisfies the other elements of retaliation, she fails to demonstrate a causal relationship between her protected activity and the conduct in question. In this case, there are two potential types of protected activity at stake. First, the record reflects that Clark made a series of internal complaints to Cline regarding workplace conduct.[12]  Clark, however, fails to specify with any level of detail when such complaints occurred. (*See, e.g.*, Pl. Dep. 38.)  Second, Clark initiated EEO proceedings on December 10, 2008 that ultimately culminated in a formal EEO Complaint in March 2009. As detailed above, Clark maintains that from 2002 until 2009 she was subject to a hostile work environment based on the conduct of her co-workers and Cline. Once again, Clark generally fails to provide precise detail as to the timing of events within her testimony. With regard to her claim of retaliation, Clark emphasizes Cline's decision to delay her return to work from late September 2008 until early December 2008.

Given the current record, Clark fails to establish that the conduct in question was causally related to her protected activity. With regard to the general conduct of her co-workers and Cline, Clark's testimony indicates that such behavior occurred on a regular basis, regardless of her complaints to Cline. Clark fails to highlight any evidence—such as temporal proximity between complaints and adverse conduct—reflecting that any of the office conduct, including her altercations with co-workers, was related to her complaints to Cline. Nor does Clark's testimony, or other evidence, link adverse actions of her co-workers to her EEO activity. Under these

---

[12] There is some question as to whether Clark's complaints to Cline were sufficiently specific to constitute protected activity under Title VII. *See, e.g.*, *Weaver v. Ohio State Univ.*, 71 F. Supp.2d 789, 793–94 (S.D. Ohio 1998) ("Complaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity."). The Court, however, will presume that Clark's internal complaints constitute protected activity.

20

circumstances, outside of pure speculation based on a vague timeline, there is no basis to infer that Clark's protected activity motivated the actions of which she complains.

Furthermore, Clark fails to present sufficient evidence that Cline's 2008 decision to delay her return to work was causally connected to protected activity. Importantly, Cline's delayed call back occurred before she commenced EEO proceedings on December 10, 2008. Cline also fails to highlight any other protected activity that occurred close to this period. Additionally, Cline's testimony reflects that he made the decision to delay Clark's return to work based on inconsistent medical reports he received from Clark's physicians as well as the USPS health unit's assessment of Clark's condition. Although Clark maintains that some of the medical evidence demonstrates she was healthy enough to return to work prior to December 2008, the record—at the very least—indicates that Cline was faced with conflicting medical accounts of Clark's condition when he delayed Clark's return to work.[13] Ultimately, without more detailed evidence relating to Cline's underlying motivations, a jury could not reasonably infer that retaliatory animus motivated Cline's actions.[14]

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 24) is **GRANTED** in part and **DENIED** in part.

---

[13] During EEO proceedings, Clark also averred that Cline allowed male co-workers to return to work, or receive accommodations, without going through a rigorous medical process. (*See* Pl. EEO Aff. 12.) Clark, however, fails to provide sufficient detail to demonstrate that such co-workers faced similar circumstances. Regardless, Clark still fails to causally connect Cline's decision to any protected activity.

[14] The Court reaches no conclusion as to whether Cline should have allowed for a reasonable accommodation.

**IT IS SO ORDERED.**

_____7-29-2013_____

**DATE**

_____

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**